UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Zahra Shahrashoob, | § | |
| PLAINTIFF | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| Texas A&M University System, Texas A&M | § | Civil Action: 4:22-cv-699 |
| at College Station, Chancellor John Sharp, | § | |
| Texas A&M Board of Regents, Katherine | § | |
| Banks-President, Dr.Arul Jayaraman, | § | |
| Dr. N.K. Anand, Damon Slaydon, Jennifer | § | |
| Smith, Dr. Blanca Lupiani, Dr. Micah Green, | § | |
| Dr. Victor Ugaz, Dr. Jodie Luthkenhaus, | § | |
| Dr.Anastasia Muliana, Jaime Andres, | § | |
| DEFENDANTS | § | ***Jury Trial Requested*** |

## COMPLAINT

**1.**      This action for civil rights violations arises under the Due Process Clause – U.S. Const. Amend. XIV, § 1 and the Equal Protection Clause – U.S. Const. Amend. XIV, § 1. Jurisdiction is conferred by Title 28 U.S.C. Section 1331.

**2.**      This action for Discrimination arises under Title VII of the Civil Rights Act of 1964. Jurisdiction is conferred by Title 42 of the United States Code, section 2000e-5 and Title 28 U.S.C. Section 1331

**3.**      This action for employment discrimination arises under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. Federal question jurisdiction is conferred by 42 U.S.C. § 12117 and 28 U.S.C. section 1331.

**4.**      This action for Discrimination arises under Title 42 of the United States Code, section 1981. Jurisdiction is conferred by Title 28 U.S.C. Section 1331.

**5.**      This action for Discrimination arises under Title VI of the Civil Rights Act of 1964. Jurisdiction is conferred by 42 U.S.C. 2000d et seq. and Title 28 U.S.C. Section 1331.

**6.** This action for Discrimination arises under Title IX of the Education Amendments of 1972. Jurisdiction is conferred by 20 U.S.C. §1681 et seq. and Title 28 U.S.C. Section 1331.

**7.** Venue is proper in this district under 28 section 1391 because a substantial part of the events or omissions giving rise to all claims occurred in this district.

**Parties**

**8.** The plaintiff is Zahra Shahrashoob who is a resident of the State of Oklahoma, currently, and was a resident of Texas at the time of the occurrence giving rise to this action.

**9.** Defendant Texas A&M University at College Station is a state entity, whose principal place of business is located at Administration Building, 400 Bizzell St, College Station, TX 77843.

**10.** Defendant Texas A&M System is a state entity, whose principal place of business is located at 301 Tarrow Street, College Station, TX 77840.

**11.** Defendant Chancellor, John Sharp, is an individual officer, who is located at 301 Tarrow Street, College Station, TX 77840.

**12.** Defendant Texas A&M Board of Regents, a group of individuals, are located at 301 Tarrow Street, College Station, TX 77840.

**13**. Katherine Banks, is the president of the university who is located at Texas A&M University at College Station, Brazos County.

**14.** Dr.Arul Jayaraman, an individual, is located at Texas A&M University at College Station, Brazos County.

**15.** Dr. N.K. Anand, an individual, is located at Texas A&M University at College Station, Brazos County.

16.     Damon Slaydon, an individual, is located at Texas A&M University at College Station, Brazos County.

17.     Jennifer Smith, an individual, is located at Texas A&M University at College Station, Brazos County.

18.     Dr. Blanca Lupiani, an individual, is located at Texas A&M University at College Station, Brazos County.

19.     Dr. Micah Green, an individual, is located at Texas A&M University at College Station, Brazos County.

20.     Dr. Victor Ugaz, an individual, is located at Texas A&M University at College Station, Brazos County.

21.     Dr. Jodie Luthkenhaus, an individual, is located at Texas A&M University at College Station, Brazos County.

22.     Dr.Anastasia Muliana, an individual, is located at Texas A&M University at College Station, Brazos County.

Jaime Andres, an individual, is located at Texas A&M University at College Station, Brazos County.

**Facts**

23.     Texas A&M University receives hundreds of millions of dollars in federal funding, annually.

24.     These funds include funding for research performed by A&M's faculty and funding to achieve ethnic, gender, and other forms of diversity, of its faculty.

25.     Additionally, Defendants maintain a Title IX compliance department.

26.     Texas A&M University at College Station employs over 3,000 faculty and the Texas A&M System employs over 26,000 faculty and staff.

27.     Plaintiff, Zahra Shahrashoob, has a PhD in Chemical Engineering and has an extensive background, several years, in conducting research.

28.     Plaintiff is a woman whose nationality is Iranian. She filed the EEOC Charge within 180 days and 300 days of the incidents giving rise to this action, all incidents within the appropriate window of time as a result of the continuing tort doctrine and there being no break in the chain of discriminatory events. Plaintiff files this lawsuit within the 90 day window to bring suit as the Right to Sue Letter was submitted on December 7, 2021.

29.     She was the only faculty member of Iranian nationality in her department and was the only faculty woman of color in her department.

30.     During September of 2018, Plaintiff received an offer letter from Texas A&M University for the position of lecturer in the Department of Chemical Engineering.

31.     Because A&M had a lot of faculty who were not US citizens, the university had a program/process implemented for acquiring work visas on behalf of those faculty. Plaintiff, Ms. Shahrashoob, accepted the offer of employment made by A&M, in significant part, because of A&M's representation that it would acquire a work visa on behalf of Ms. Shahrashoob.

32.     Plaintiff began working at Texas A&M in September of 2018 for a lower salary than what was made by other faculty of a different gender and nationality from her own.

33.     Furthermore, there was a white male faculty member with the same credentials and qualifications as Plaintiff who was hired for the Chemical Engineering department after Plaintiff was hired. This person was given a salary of $75,000, approximately $10,000 more than what Plaintiff, Ms. Shahrashoob was given.

**34.**     Plaintiff was the only PhD faculty that was not given an office. Instead, she was given a cubicle to share with others who were not PhD faculty. Additionally, during the Spring of 2019, Plaintiff was required to teach more courses, not an obligation under her job responsibilities, without the additional compensation that was given to other faculty members who increased the number of courses they taught.

**35.**     Plaintiff was initially told that the university would acquire the work visa on her behalf, as was done with every other faculty member in the department who was not a US citizen. However, when speaking to Karim Nazmul in February of 2019, the head of the chemical engineering department at that time, he informed Plaintiff that she would have to take additional steps, on her own, to secure her own work visa.

**36.**     In March of 2019, Arul Jayaramam, became the department head of Chemical Engineering. He knew about Plaintiff's needs for the work visa and the promise to secure Ms. Shahrashoob's work visa, as was done with other non US resident faculty, but he refused to complete all of the necessary steps to facilitate the work visa application, including delaying to complete the Form I-983.

**37.**     In the fall of 2019, Mr. Jayaraman gave Plaintiff more courses to teach and new research obligations to fulfill. However, Plaintiff's salary remained the same even though other similarly situated non-tenured faculty charged with similar responsibilities received salaries exceeding $100,000.

**38.**     Furthermore, all of the faculty received a start-up fund to aid with research. However, Plaintiff was denied this start up fund. The only distinguishing factor, regarding the receipt of this start up fund, between her and the other faculty was her Iranian nationality.

39.     Initially, Ms. Shahrashoob was a lecturer, but she was given a new title of Instructional Assistant Professor in 2019. This position came with more obligations. However, Plaintiff's salary was not increased to reflect these increased obligations. Ms. Shahrashoob requested that her salary be commensurate with her professional responsibilities, but Defendants refused her request.

40.     In the fall of 2019, Arul Jayaramam confessed to Plaintiff, after she repeatedly addressed concerns over the Defendants' lack of action taken in regards to securing her work visa, telling her that, "She was not a priority," when explain why no action had been taken.

41.     The lack of action taken by the Defendants was egregious in that Defendants diligently sought to secure work visas for male faculty of Indian descent. Ms. Shahrashoob impressed upon her department heads and other administrative persons that her parents and grandparents were in bad health and that they were all dying back in Iran. She explained that without the work visa in place, she could not leave the country and expect to be readmitted to be with her husband and reunited with her professional life's work.

42.     Yet, her pleas were met with callousness and indifference. As had been the case before, no work was performed to secure a work visa on Plaintiff's behalf, as what was done for every other non US citizen in the department. Ultimately, her parents and grandparents died without her being able to see them one last time.

43.     In January of 2020, Plaintiff did receive a minimal raise to $73,000.

44.     However, in February of 2020, and in the new offer letter that Plaintiff accepted, she was to be given a raise to $98,000, along with a start-up fund to aid in conducting research.

45.     But Defendants denied this raise and denied giving Plaintiff a start-up fund. Additionally, Arul Jayaramam mandated that she teach classes in the summer. Other faculty had

a choice to teach classes in the summer. And summer teaching came with an increase in pay for those faculty members. But Plaintiff was not given an increase in pay for the increased obligation of teaching classes in the summer. Nor was Plaintiff given a choice as to whether she even wanted to teach additional classes in the summer.

**46.**     Jaime Andres, an administrator, responded to Plaintiff's complaints about the terms of her new offer letter that were refused in reality and her other employment complaints, by stating to her that her culture (Plaintiff's culture) impeded her ability to understand and appreciate the excuses and treatment directed towards Plaintiff. These statements were endorsed by N. K. Anand and Arul Jayaramam.

**47.**     During this period of interaction surrounding the matter of the new offer, Arul Jayaramam informed Ms. Shahrashoob that before accepting the new offer, she should get permission to do so from her husband. Plaintiff was insulted by this condescension directed towards her.

**48.**     Additionally, Jaime Andres, ridiculed Plaintiff by explaining to her that she needed mental health counseling, deriding her for making complaints.

**49.**     Jodie Luthkenhouse, another faculty member who had the same credentials and responsibilities that Plaintiff had, in prior instances, had humiliated Plaintiff. However, Jodie Luthkenhouse retaliated against Plaintiff by not inviting Plaintiff to staff meetings of faculty in the Chemical Engineering Department, meetings, she had been invited to before making her complaint.  This retaliation took place after Plaintiff made complaints of discrimination.

**50.**     In the spring of 2020, Plaintiff informed Damon Slaydon of her complaints. Plaintiff still had not received an office, like every other faculty member, nor had she received her work

visa, nor has she received the increase in salary she was promised in the previous offer letter. Slaydon said he would address these concerns, but never did.

**51.**     Anastasia Muliana, in her professional capacity, failed to report Plaintiff's Title 9 complaint.

**52.**     In May of 2020, Plaintiff received another correspondence that Plaintiff would not be paid the salary of the offer she had accepted with the pay increase. This was after Plaintiff had made more complaints of discrimination.

**53.**     In July of 2020, Plaintiff made a request for reasonable accommodation not to teach class in person due to the COVID pandemic. Plaintiff is in the increased at risk group due to her asthma, facilitating a higher degree of complications arising from COVID infection.

**54.**     Defendants allowed other similarly situated faculty to work from home but prevented Plaintiff from doing so after she had made complaints of discrimination.

**55.**     Furthermore, Plaintiff was the only PhD required to teach labs after she made complaints of discrimination.

**56.**     Blanca Lupiani denied all requests for reasonable accommodations made by Plaintiff.

**57.**     Plaintiff's contract was set to expire in May of 2021. However, Texas A&M University and Defendants terminated her in January of 2021, after the periods of Plaintiff voicing complaints of discrimination.

**58.**     During the latter stages of Plaintiff's employment with Defendants, Micah Green refused to invite Plaintiff to faculty meetings and include her on faculty correspondence. These actions by Micah Green occurred after Plaintiff had made complaints of discrimination.

**59.** After Plaintiff was terminated and subsequently began work at the University of Oklahoma, Micah Green contacted her supervisor at the University of Oklahoma and defamed her to that supervisor.

**60.** Victor Ugaz assigned online course to faculty as an associate department head. He refused to assign any online classes to Plaintiff, after she made a request for reasonable accommodation, in retaliation for her complaints of discrimination.

**61.** Jennifer Smith was the Title IX director. She took no action to investigate Plaintiff's Title IX discrimination claims while Plaintiff was still employed with Defendants.

**Count I. Violation of Due Process and Equal Protection Clause – U.S. Const. Amend. XIV**

**62.** Plaintiff was denied the same rights afforded to faculty that were similarly situated but faculty that were of a different gender and nationality. Plaintiff's gender and nationality are protected classes. Plaintiff's contractual rights and employment rights were not respected as those rights of other faculty. She was denied the same salary as other similarly situated faculty distinguished by gender and nationality from Plaintiff. She was denied salary that had been promised her through offers she accepted. She was not given an office but instead, given a cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

**63.** Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable

accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

64.     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

65.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

66.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

67.     The education program that is Texas A&M University at College Station, an academic endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally, she suffered adverse treatment in this program due to her gender and her nationality.

68.     Texas A&M University receives federal assistance to aid in its mythical objective to achieve faculty diversity, maintaining a department seeking to accomplish this objective. The university receives a large amount of federal funding to assist with scholarly research and to supplement the operation of an environment that fosters academic productivity from both faculty and students.

69.     Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University,

experiences that run afoul of the professed goals and objectives of the university, she has suffered a great deal of anger, emotional distress, lost wages, and career advancement, along with the prestige and accolades that come with such accomplishments. And she has lost the satisfaction accompanying the professional advancement resulting from all of the blood, sweat, and tears expended from pursuing her life's work.

## Count II. Violation of Title VII of the Civil Rights Act of 1964

70.     Plaintiff was denied the same rights afforded to faculty that were similarly situated but faculty that were of a different gender and nationality. Plaintiff's gender and nationality are protected classes. Plaintiff's contractual rights and employment rights were not respected as those rights of other faculty. She was denied the same salary as other similarly situated faculty distinguished by gender and nationality from Plaintiff. She was denied salary that had been promised her through offers she accepted. She was not given an office but instead, given a cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

71.     Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

72.     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more

courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

73.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

74.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

75.     The education program that is Texas A&M University at College Station, an academic endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally, she suffered adverse treatment in this program due to her gender and her nationality.

76.     Texas A&M University receives federal assistance to aid in its mythical objective to achieve faculty diversity, maintaining a department seeking to accomplish this objective. The university receives a large amount of federal funding to assist with scholarly research and to supplement the operation of an environment that fosters academic productivity from both faculty and students.

77.     Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University, experiences that run afoul of the professed goals and objectives of the university, she has suffered a great deal of anger, emotional distress, lost wages, and career advancement, along with the prestige and accolades that come with such accomplishments. And she has lost the

satisfaction accompanying the professional advancement resulting from all of the blood, sweat, and tears expended from pursuing her life's work.

### Count III. Violation of the Americans with Disabilities Act of 1990

**78.**     Plaintiff was denied the same rights afforded to faculty that were similarly situated but faculty that were of a different gender and nationality. Plaintiff's gender and nationality are protected classes. Plaintiff's contractual rights and employment rights were not respected as those rights of other faculty. She was denied the same salary as other similarly situated faculty distinguished by gender and nationality from Plaintiff. She was denied salary that had been promised her through offers she accepted. She was not given an office but instead, given a cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

**79.**     Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

**80.**     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

81.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

82.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

83.     The education program that is Texas A&M University at College Station, an academic endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally, she suffered adverse treatment in this program due to her gender and her nationality.

84.     Texas A&M University receives federal assistance to aid in its mythical objective to achieve faculty diversity, maintaining a department seeking to accomplish this objective. The university receives a large amount of federal funding to assist with scholarly research and to supplement the operation of an environment that fosters academic productivity from both faculty and students.

85.     Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University, experiences that run afoul of the professed goals and objectives of the university, she has suffered a great deal of anger, emotional distress, lost wages, and career advancement, along with the prestige and accolades that come with such accomplishments. And she has lost the satisfaction accompanying the professional advancement resulting from all of the blood, sweat, and tears expended from pursuing her life's work.

**Count IV. Violation of Title 42 of the United States Code, section 1981**

86.     Plaintiff was denied the same rights afforded to faculty that were similarly situated but faculty that were of a different gender and nationality. Plaintiff's gender and nationality are protected classes. Plaintiff's contractual rights and employment rights were not respected as those rights of other faculty. She was denied the same salary as other similarly situated faculty distinguished by gender and nationality from Plaintiff. She was denied salary that had been promised her through offers she accepted. She was not given an office but instead, given a cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

87.     Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

88.     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

89.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

90.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

91.     The education program that is Texas A&M University at College Station, an academic endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally, she suffered adverse treatment in this program due to her gender and her nationality.

92.     Texas A&M University receives federal assistance to aid in its mythical objective to achieve faculty diversity, maintaining a department seeking to accomplish this objective. The university receives a large amount of federal funding to assist with scholarly research and to supplement the operation of an environment that fosters academic productivity from both faculty and students.

93.     Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University, experiences that run afoul of the professed goals and objectives of the university, she has suffered a great deal of anger, emotional distress, lost wages, and career advancement, along with the prestige and accolades that come with such accomplishments. And she has lost the satisfaction accompanying the professional advancement resulting from all of the blood, sweat, and tears expended from pursuing her life's work.

**Count V. Violation of Title VI of the Civil Rights Act of 1964**

94.     Plaintiff was denied the same rights afforded to faculty that were similarly situated but faculty that were of a different gender and nationality. Plaintiff's gender and nationality are protected classes. Plaintiff's contractual rights and employment rights were not respected as those rights of other faculty. She was denied the same salary as other similarly situated faculty

distinguished by gender and nationality from Plaintiff. She was denied salary that had been promised her through offers she accepted. She was not given an office but instead, given a cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

95.     Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

96.     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

97.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

98.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

99.      The education program that is Texas A&M University at College Station, an academic

endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited

Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally,

she suffered adverse treatment in this program due to her gender and her nationality.

100.    Texas A&M University receives federal assistance to aid in its mythical objective to

achieve faculty diversity, maintaining a department seeking to accomplish this objective. The

university receives a large amount of federal funding to assist with scholarly research and to

supplement the operation of an environment that fosters academic productivity from both faculty

and students.

101.    Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University,

experiences that run afoul of the professed goals and objectives of the university, she has

suffered a great deal of anger, emotional distress, lost wages, and career advancement, along

with the prestige and accolades that come with such accomplishments. And she has lost the

satisfaction accompanying the professional advancement resulting from all of the blood, sweat,

and tears expended from pursuing her life's work.

### Count VI. Violation of Title IX of the Education Amendments of 1972

102.    Plaintiff was denied the same rights afforded to faculty that were similarly situated but

faculty that were of a different gender and nationality. Plaintiff's gender and nationality are

protected classes. Plaintiff's contractual rights and employment rights were not respected as

those rights of other faculty. She was denied the same salary as other similarly situated faculty

distinguished by gender and nationality from Plaintiff. She was denied salary that had been

promised her through offers she accepted. She was not given an office but instead, given a

cubicle to share with non-PhD staff, while other similarly situated faculty distinguished by

nationality and gender from Plaintiff, were given offices. She was not given a start-up fund to assist with research as were all of the other similarly situated faculty, distinguished by gender and nationality from Plaintiff.

103.     Plaintiff suffered the ability to enter into another contract for employment with Defendants through a renewal that other similarly situated faculty, distinguished from Plaintiff only by gender and nationality, enjoyed. Similarly, Plaintiff's request for reasonable accommodations were denied arbitrarily, despite Defendants' granting the opportunity to teach from home though online classes to other faculty.

104.     Furthermore, Plaintiff suffered additional adverse treatment in violation of her rights for asserting her rights through complaints of employment discrimination.  She was given more courses to teach compared to other faculty that were similarly situated, but distinguished by gender and nationality.

105.     Plaintiff was excluded from participation in professional activities and programs due to her nationality. She was denied the ability to participate in grant funded research, as she was denied the start-up fund and burdened with more teaching courses, further impeding her ability to participate in research, funded in significant part by the federal government.

106.     Furthermore, Plaintiff was discriminated against on the basis of gender in an education program. She was denied the same opportunity to conduct research, funded significantly, by the federal government.

107.     The education program that is Texas A&M University at College Station, an academic endeavor receiving federal funds to aid in its operation of that academic endeavor, prohibited Plaintiff from enjoying the same rights as others due to her gender and nationality. Additionally, she suffered adverse treatment in this program due to her gender and her nationality.

**108.**     Texas A&M University receives federal assistance to aid in its mythical objective to achieve faculty diversity, maintaining a department seeking to accomplish this objective. The university receives a large amount of federal funding to assist with scholarly research and to supplement the operation of an environment that fosters academic productivity from both faculty and students.

**109.**     Yet, given what Ms. Shahrashoob suffered while employed at Texas A&M University, experiences that run afoul of the professed goals and objectives of the university, she has suffered a great deal of anger, emotional distress, lost wages, and career advancement, along with the prestige and accolades that come with such accomplishments. And she has lost the satisfaction accompanying the professional advancement resulting from all of the blood, sweat, and tears expended from pursuing her life's work.

<strong>Jury Demand</strong>

**110.**     Plaintiff Zahra Shahrashoob demands a trial by jury on all issues triable as of right by a jury.

<strong>PRAYER</strong>

**111.**     Plaintiff respectfully prays that the Court award judgment in favor of Plaintiff for violation of Plaintiff's rights and that the Court award the following:

        a. actual and consequential damages, plus interest

        b. attorney's fees and costs of court

        c. all other relief that justice may require

        Respectfully submitted,

        The Bozeman Law Firm

/s/ Marc Anson Bozeman
Attorney-In-Charge
Texas State Bar No. 24057044
Federal Bar No. 1533462
5499 Braesvalley Dr., No. 462
Houston, Texas 77096
Telephone: (832) 741-7950
mb@bozemanlitigation.com

ATTORNEY FOR PLAINTIFF